HOBBS-WESTERN COMPANY *v.* CRAIG.

4-7792                              192 S. W. 2d 116

Opinion delivered January 21, 1946.

Rehearing denied February 18, 1946.

*Bridges, Bridges, Young & Gregory* and *Buzbee, Harrison & Wright,* for appellant.

*J. H. Lookadoo* and *McMillan & McMillan,* for appellee.

McFADDIN, J. Appellants, Hobbs-Western Co. and its insurance carrier, seek to have set aside an award of the Workmen's Compensation Commission in favor of appellees, the widow and children of John Craig, deceased workman. Appellants contend that John Craig was an employee of Steve Lea, rather than Hobbs-Western Co., and that Steve Lea was not a subcontractor of Hobbs-Western Co. within the purview of § 6 of the

Workmen's Compensation Law of Arkansas (Act No. 319 of 1939).

The Commission found that Steve Lea was a subcontractor of Hobbs-Western Co. within § 6 of the Workmen's Compensation Law. We are asked by the appellants to hold "that there was not sufficient competent evidence in the record to warrant the making of the award" or "that the facts found by the Commission do not support the award." These are grounds 4 and 3 in § 25(b) of the Act, and together necessitate (1) an examination of the evidence before the Commission to see if there was sufficient competent evidence in the record to justify the findings, and (2) a study of the facts found by the Commission to see if they support the award.

In examining to see if there is sufficient evidence in the record to justify the finding of the Commission, we have repeatedly announced that the finding of the Commission on the facts is entitled to the force and effect of a jury verdict, and that we review the evidence in the light most favorable to the appellee. *Fordyce Lumber Co.* v. *Shelton,* 206 Ark. 1134, 179 S. W. 2d 464, and cases there cited. See, also, West's Arkansas Digest, "Workmen's Compensation," § 1939 and § 1964. On the contention that the facts found by the Commission do not support the award, the position of the appellants is about the same as though they were moving for a judgment *non obstante veredicto,* in which situation every intendment of the general verdict is construed against the movant. *Iowa City State Bank* v. *Biggadike,* 131 Ark. 514, 199 S. W. 539; *Kansas City So. Ry. Co.* v. *Leinen,* 144 Ark. 454, 223 S. W. 1; West's Arkansas Digest, "Trial," § 359.

The opinion and award of the Commission is eight typewritten pages in length, and review in detail the testimony of each witness. We summarize the findings of the Commission, and the evidence as follows:

(1) The Hobbs-Western Co., a corporation, (hereinafter referred to as "Hobbs-Western") is engaged in the business of producing and selling cross ties to various railroad companies. Hobbs-Western was under a con-

tract with the Chicago, Rock Island & Pacific Railway Company and its trustee in bankruptcy (all hereinafter referred to as "Rock Island"), which contract, *inter alia*, obligated Hobbs-Western: "to produce cross ties on the line of the railway company," and "the quantity of such cross ties to be furnished shall be for the railway's entire requirements for the period of contract." In other words, Hobbs-Western was to produce for Rock Island all the cross ties that it needed during the period of the contract.

(2) Before the war emergency, Hobbs-Western had purchased most of its ties from individual farmers; but, due to the shortage of agricultural labor, not enough cross ties were produced by farmers to supply Hobbs-Western's requirements, so—to meet that situation and to secure enough cross ties to fulfill its contract with Rock Island—Hobbs-Western undertook the financing of some eight or ten individually operated tie mills in Dallas county, Arkansas; and each such mill manufactured cross ties and delivered them to the tie yard of Hobbs-Western at Sparkman, Arkansas, where the ties were accepted by Rock Island. Steve Lea was one of the individuals so financed by Hobbs-Western.

(3) On September 18, 1943, Hobbs-Western obtained a tie mill and one truck for Steve Lea at a total cost of $2,575, and took his note due on demand for this entire amount, and secured the note by a mortgage on the tie mill and truck. Steve Lea did not invest a penny of his own money in the tie mill and truck. About the same time Hobbs-Western purchased from Charles Petty, for $900 cash, all the timber on 120 acres of land, and took the timber deed in the name of Hobbs-Western. Then Hobbs-Western made an oral contract with Steve Lea, whereby he would locate the said mortgaged tie mill on the Petty land and manufacture the Petty timber into cross ties, and use the mortgaged truck in hauling the ties to the Hobbs-Western tie yard at Sparkman, Arkansas. Lea recruited the laborers to manufacture the ties and to deliver the same to the Sparkman tie yard, but did not carry any workmen's compensation insurance, or in any other way comply with the Workmen's Compensation Law.

(4) Steve Lea was paid by Hobbs-Western at an average price of 80c per tie for each tie he delivered; but from the 80c Hobbs-Western was to retain:

(a) 10c per tie until the $2,575 note was paid in full; and also

(b) 12c per tie until Hobbs-Western had received therefrom the $900 it had paid for the Petty timber, and then 6c per tie on all other ties thereafter produced from the Petty timber. At the time that John Craig was injured Hobbs-Western was retaining 22c from the average price of 80c of each tie (since the $900 had not been received by Hobbs-Western). From the remaining 58c, Steve Lea paid the laborers who worked in the tie mill and on the truck.

(5) One of these laborers was John Craig, who received an injury on September 25, 1943, arising out of and in the course of his said employment; and John Craig died on September 30, 1943, as a direct result of said injury. It is clear that Steve Lea had no financial means and that Hobbs-Western had control over his operations and financed him for the purpose of Hobbs-Western obtaining the cross ties. The following appears in the cross-examination of the representative of Hobbs-Western:

"Q. If he (Steve Lea) had gone out on the Charles Petty tract and cut all the trees into lumber, and sold it to the Camden Furniture Co., or to anyone else, what would you have done about it?

"A. As long as he owed me money, I wouldn't let him do it.

. . .

"Q. You are not in the finance business—you are interested in turning out cross ties, aren't you?

"A. That's right."

The facts which we have just reviewed are facts which not only appear in the record, but which were also found by the Commission; and the question now becomes: Do these facts justify the award? We hold that they do.

Before discussing the law, we dispose of two contentions made by appellants:

(1) We regard as unimportant the contention that Steve Lea received as his own the slabs and extra pieces of wood (called "tie sidings"), remaining after a tree had been manufactured into cross ties. There is no finding that this residue amounted to any appreciable item, or that any disposition was ever made of any such residue from the Petty tract.

(2) The appellants argue that Steve Lea was not obligated to deliver *all* the ties to Hobbs-Western, and could have sold ties to others, or manufactured the trees into lumber rather than cross ties. We consider this argument as unimportant, because Hobbs-Western's representative, as quoted above, stated that Hobbs-Western would not have allowed Lea to manufacture the Petty timber into lumber, rather than cross ties. Hobbs-Western had the right to exercise control over Steve Lea in the manufacture of the Petty timber into cross ties.

We come now to the law. Section 6 of the Arkansas Workmen's Compensation Law reads in part:

"A contractor in the performance of whose contract one or more persons are employed, either by himself or by a subcontractor, who subcontracts all or any part of such contract shall be liable for and shall pay compensation to any employee injured whose injury arises out of and in the course of such employment, unless the subcontractor primarily liable therefor has secured compensation for such employee so injured as provided in this Act."

The Arkansas Workmen's Compensation Law was not taken in whole from the statutory law of any particular state, and we therefore have no previous adjudications of such other state as binding on us in our construction of the Act. We are thus free to give the Arkansas law an interpretation consistent with the liberal spirit of the Act. In only two other cases has this court commented on this § 6, and those cases are not pertinent to

the issue here. They are *Thomas Bros. Lbr. Co.* v. *Hill,* 204 Ark. 976, 166 S. W. 2d 3, and *Magnolia Petroleum Co.* v. *Griych,* 206 Ark. 352, 176 S. W. 2d 435. So far as our investigation has disclosed, § 6 of the Arkansas act is similar to, but not identical with the corresponding provisions in the law of any other state.

In *Schneider on Workmen's Compensation,* permanent edition, Text Volume II, page 176, in commenting on the subcontractor provisions in the Workmen's Compensation Laws of the various states, this is stated:

"The apparent legislative purpose of constituting the principal contractor a statutory employer is to prevent evasion of the act; to protect the employees of subcontractors who are not financially responsible; to induce all employers to carry insurance; or to make the principal contractor a guarantor of the personal injury obligations of the sub-contractor. However, to constitute a principal contractor the statutory employer of the employees of the sub-contractor, there must be some contractual relationship between the two, so that if there is merely a contract of purchase or some other relation besides that of principal and contractor, there will be no liability."

In 58 A. L. R. 872 there is an annotation, "Construction and effect of specific provisions of workmen's compensation acts in relation to employees of independent contractors or subcontractors," and it is there stated:

"It would seem that the chief purpose of provisions of this type is to protect the employees of subcontractors who are not financially responsible, and to prevent employers from relieving themselves of liability by doing through independent contractors what they would otherwise do through direct employees."

This annotation is supplemented in 105 A. L. R. 581. In 71 C. J. 483, *et seq.,* there is an extended discussion of the subcontractor provision, and on page 485 the text reads:

"The purpose of provisions of the character under consideration is not for the protection of subcontractors;

they were enacted for the purpose of giving employees of the contractor a remedy against the principal, the object being to afford full protection to workmen by preventing the possibility of defeating the compensation act by hiring irresponsible contractors or subcontractors to carry on a part of the employer's work."

We have given these quotations so that it might be readily apparent that we are construing § 6 of our Act in accordance with the general statement of purposes of the subcontractor section.

But appellants most seriously insist that the facts, as herein stated, do not support the conclusion that Steve Lea was a subcontractor of Hobbs-Western within the intendment of § 6 of the Arkansas Workmen's Compensation Act; and in support of their position appellants cite the following cases: *Harris* v. *Southern Kraft Co., et al.* (La. App.), 183 So. 65; *Anthony* v. *Natalbany Lumber Co.* (La. App.), 187 So. 288; *Perkinson, et al.,* v. *Thomas,* 158 Va. 699, 164 S. E. 561; *Madison Entertainment Corp., et al.,* v. *Kleinheinz, et al.,* 211 Wis. 459, 248 N. W. 415; *City of Hudson* v. *Industrial Commission, et al.,* 241 Wis. 476, 6 N. W. 2d 217; *Employers' Mutual Liability Ins. Co., et al.,* v. *Industrial Commission, et al.,* 224 Wis. 527, 272 N. W. 481; *Williams* v. *George, et al.,* (La. App.), 15 So. 2d 823; *Eley* v. *Benedict,* 113 Ind. App. 202, 46 N. E. 2d 492. Of course, the value of any case from another jurisdiction depends, not only upon the identity of the statute involved as compared with our statute, but also on the similarity of the essential facts in the case cited as compared with the facts in the case here under consideration. For purposes of this opinion, we may disregard the dissimilarity of statutes, and consider only the dissimilarity of facts:

(1) *Harris* v. *Southern Kraft Corp., supra,* was decided by the Louisiana Court of Appeals in 1938. Harris received injuries while working as a woodcutter for Stotts who was engaged in cutting and hauling pulp wood which was sold by him to Southern Kraft Corp. On the theory that Stotts was a subcontractor of Southern Kraft Corp.,

Harris sought an award against Southern Kraft Corp. under the subcontractor section of the Louisiana Workmen's Compensation Law. The Louisiana Court of Appeals stated the facts:

"Stotts has been engaged for eleven years in cutting, hauling and marketing pulp wood. As a rule he buys the timber from land owners and hires men to cut it into required lengths and stack it. He hires other men to haul it to the nearest railroad points at which it is loaded into cars and shipped to the purchaser. He pays for the stumpage, for the cutting, hauling and loading. For these purposes he hired and fired whom he pleased. The wood was not engaged or contracted to any one until loaded on cars destined for the plant.

"The arrangement between this company and Stotts appears to be as follows: The company purchased his wood as it was needed and as he was able to deliver it to them in cars. He was not obligated to sell the wood to it, nor was it obligated to buy any quantity of wood from him, excepting such as was covered by specific orders to him. . . . The Company exercised no control or supervision whatever over the cutting, hauling or loading of the wood. On each Wednesday a check would be mailed to Stotts to pay for wood received during the previous week ending on Saturday. He was paid $3.50 per cord for all wood accepted at Bastrop. This price was subject to change at any time, dependent upon the company's will. The *modus operandi* between these defendants, reflected from the foregoing statement of facts, clearly negatives a contractual relationship between them. It does prove a relationship of buyer and seller. To such relationship, the workmen's compensation law, Act No. 20 of 1914, cannot be made to apply. If this were not true, it may readily be seen, commerce and business dealings would be seriously interfered with and hampered. A merchant in Shreveport, after placing an order for goods with a manufacturer in New Orleans, would become responsible for compensation due a workman of the manufacturer injured while manufacturing the goods ordered."

On these facts, the Louisiana Court of Appeals denied an award against Southern Kraft Corporation.

We are in full agreement with such a conclusion. If the facts here were the same as in *Harris* v. *Southern Kraft Corp.*, we would easily reach a conclusion of no liability on the part of Hobbs-Western. But, here, there are these distinguishing facts, the counterparts of which are not found in *Harris* v. *Southern Kraft Corp.*: (a) Hobbs-Western entirely financed all of the operations' of Steve Lea, for the purpose of obtaining cross ties to fulfill a particular contract of Hobbs-Western. (b) Hobbs-Western held a demand note and mortgage on the entire plant and equipment of Steve Lea. (c) Hobbs-Western could and would have prevented Lea from manufacturing the timber into lumber for sale to others. (d) Hobbs-Western purchased the timber and took the title in its own name, and was to participate to the extent of 6c per cross tie on all the proceeds from the timber after the initial cost had been repaid. Some of these facts standing alone might not be sufficient differentiation from the case of Southern Kraft Corp., but when all concur, then the relationship between Hobbs-Western and Steve Lea in the case at bar is entirely different from the relationship of Southern Kraft Corp. and Stotts in the cited case; and this difference is so great that we cannot say that the award of the Arkansas Workmen's Compensation Commission is erroneous.

(2) In *Anthony* v. *Natalbany Lumber Co., supra,* Cass Anthony was injured while working at a lumber mill operated by Steve Anthony. Cass Anthony sought recovery from Natalbany Lumber Co. on the theory that Steve Anthony was a subcontractor of the Natalbany Lumber Co.; but the Louisiana Court of Appeals detailed the course of dealings between Steve Anthony and the lumber company, and held that Steve Anthony was a seller and not a subcontractor. What we said about *Harris* v. *Southern Kraft Corp.* applies with equal force and differentiation to this case.

(3) Likewise, a review of the facts in *Perkinson* v. *Thomas, supra,* shows facts similar to *Harris* v. *South-*

*ern Kraft Corp.,* and does not contain facts such as shown in the case at bar.

(4) In *Madison Entertainment Corp.* v. *Kleinheinz, supra,* the injured person (appellee) was a professional baseball player on the team known as the "Madison Blues," and received injury while leaving the dressing rooms on the field leased and under the control of the Madison Entertainment Corp. Kleinheinz was employed by Lenahan, who was the sole owner and operator of the ball team; but Kleinheinz sought recovery from the Madison Entertainment Corp., on the theory that Lenahan was a subcontractor of the corporation under the Wisconsin Workmen's Compensation Act. The Supreme Court of Wisconsin, in denying the applicability of the subcontractor provision of the Wisconsin law, said:

"If the contract between Lenahan and the entertainment corporation was for services promotive of the ordinary and usual business of the corporation, and which would otherwise be performed through direct employees of the corporation, the conclusion would be that section 102.06 was operative and the corporation liable for injuries to employees of Lenahan. That such is not the situation is quite clear under the evidence. The Madison Entertainment Corporation was not organized to give entertainments through and by its employees. Its business was the promotion of entertainments in order to exploit the facilities of the baseball field. Its position was analogous to that of the owner of a theater who gives guaranties to traveling shows in order to promote the profitable operation of the plant constituting the theater. Its business was the furnishing of facilities for giving entertainments, rather than the giving of them through its own efforts. Hence the corporation was not attempting to discharge its business through independent contractors and thus avoid the necessity of doing business through direct employees. Section 102.06 is not applicable."

(5) *Employers' Mutual Liability Ins. Co.* v. *Industrial Commission* is another Wisconsin case, and involves the logging and lumber business. Thomison, an employee

of Peterson received injury arising out of and in the course of his employment. On the theory that Peterson was a subcontractor of the Gagen Lumber Co., Thomison sought an award against the lumber company. The facts showed that Peterson was a farmer, and at various times sold logs to Gagen Lumber Co. The company had loaned Peterson money with which to purchase land and equipment, but Peterson owned all his trucks and his logging equipment, and sold to others. There was no evidence that Gagen Lumber Co. financed the entire operations of Peterson, or held a demand note and mortgage on his entire property, or could have prevented him from manufacturing logs into lumber, and selling to others, or that Gagen had taken title to the timber to be manufactured and was to participate in the profits from the timber. The presence of these facts in the case at bar distinguishes it from the cited case. If we had in the case at bar only the set of facts as presented in the cited case, we might readily reach, in this case, the same conclusion as reached by the Wisconsin court in the cited case. But here we have an entirely different set of facts.

A further review of cases cited by the appellant would only serve to lengthen this opinion. Hobbs-Western was under contract to the Rock Island to provide cross ties. From its manner of doing business in the case at bar, we conclude that Hobbs-Western adopted the works and servants of Steve Lea as its own instrumentality in its effort to fulfill its contract with the Rock Island just as effectively as if Hobbs-Western had directly subcontracted a portion of its said contract to Steve Lea by means of the most deliberate and solemn subcontract. In this situation, when Hobbs-Western failed to require Steve Lea to comply with the Workmen's Compensation Law, then Hobbs-Western thereby placed itself under the liability provided in § 6 of the Act. In accordance with these views, we affirm the case.