## HUFFSTETTLER v. LION OIL CO.

### Civ. A. No. 579.

United States District Court
W. D. Arkansas, El Dorado Division.

Feb. 14, 1953.

Wood & Smith, Little Rock, Ark., and John F. Gibson, Dermott, Ark., for plaintiff.

Moore, Burrow, Chowning & Mitchell, Little Rock, Ark., for defendant.

JOHN E. MILLER, District Judge.

On September 10, 1952, the plaintiff, Bonner Huffstettler, filed his complaint against the defendant, Lion Oil Company, hereinafter often referred to as Lion, in the Circuit Court of Ashley County, Arkansas, in which he alleged:

Plaintiff is a resident of Ashley County, Arkansas. Defendant is a Delaware corporation doing business in Ashley County, Arkansas, and maintains its principal office in El Dorado, Arkansas.

On February 6, 1952, Lion was the owner of a "petroleum bulk plant" at Hamburg, Arkansas, consisting of warehouses, office, equipment, etc.; that Lion owned all property and stock located in and upon the premises, except the equipment used by M. F. Taylor, its distributor, in delivering Lion products to its customers; that Lion furnished this bulk plant, and operating facilities located thereon, to M. F. Taylor in furtherance of its effort in marketing its products.

Plaintiff was employed by M. F. Taylor and his duties consisted of, among other things, delivering Lion products to consumers and retailers; that about one o'clock p. m. on February 6, 1952, in performance of his duties as a tank truck driver and salesman of Lion products, plaintiff was informed by Mr. Frank Woods, who was at the time employed by M. F. Taylor, and who was known to the plaintiff as the bulk plant manager, that Mrs. Joe Kustren (Kusturin) was without gasoline, and Woods instructed plaintiff to make the delivery; that plaintiff obtained the keys from the wareroom in order to unlock the lower valve of the gasoline storage tank, which was located directly in front of the door to the office of the bulk plant; that approximately four feet above the lower valve was a lever valve which was used to regulate the flow of gasoline from the storage tank into the delivery truck, and that this valve was usually and customarily operated while standing on the truck, from which place the flow of the gasoline into the truck could be regulated.

The lower valve was a screw-type valve, and as plaintiff opened the valve, gasoline gushed out of and from the loading pipe arm and the pipe sleeve which was situated over the arm, falling upon him and upon the platform on which he stood. That plaintiff began to close the lower valve at which time he heard an unusual sound, resembling a strong wind. That the sound came from behind him, and within an instant he was enveloped in flame.

At the time the gasoline escaped from the loading pipe there was an open-face natural gas heating stove, which was aflame, located in the office not more than 12 feet from the point where he was standing at the time of the explosion; that he had no knowledge that natural gas was burning within the stove at the time of the

224

explosion; that it was a warm day and the door of the office was open; that the explosion originated at the location of the open-face heating stove and that the blast of fire which covered him came from his back and from the open-face heating stove.

Plaintiff received severe and permanent injuries as a result of the explosion.

The defendant was guilty of negligence which was the proximate cause of the accident. That defendant's negligence consisted of:

"a. The failure of the defendant, Lion Oil Company to provide and furnish the plaintiff, Bonner Huffstettler, with a safe place to work.

"b. The failure of the defendant, Lion Oil Company to exercise ordinary care in permitting and placing an open-face heater within 12 feet of the loading pipe.

"c. The failure of the defendant, Lion Oil Company to recognize the danger to which persons were exposed as a result of an open flame, when they had, or should have had, superior knowledge as to the peculiar combustible qualities of their product, gasoline.

"d. The failure of the defendant, Lion Oil Company, to use ordinary care in requiring the servants of M. F. Taylor to load gasoline near an open and unguarded flame.

"e. The failure of the defendant, Lion Oil Company, to properly warn the employees of M. F. Taylor as to the danger existing at their petroleum bulk plant at Hamburg, Arkansas.

"f. The failure of the defendant, Lion Oil Company to properly construct its buildings and equipment in a fashion sufficient to protect the employees of M. F. Taylor."

Plaintiff was not guilty of any contributory negligence.

Plaintiff prayed judgment for $143,000, costs, and all proper relief.

On September 23, 1952, the case was removed to the United States District Court for the Western District of Arkansas, El Dorado Division, on the grounds of diversity of citizenship of the parties and the amount involved.

Thereafter, the defendant on November 15, 1952, filed its motion for summary judgment in which it alleged:

That plaintiff was an employee of M. F. Taylor who was a distributor of defendant's products and in charge and control of defendant's bulk plant at Hamburg, Arkansas.

That at the time of the accident, it was and had been for many years prior thereto the defendant's custom and practice to enter into written contracts with gasoline service station operators; that such contracts were designated as "Dealer Sales Agreements" and "Equipment Rental Agreements."

That all sales made by M. F. Taylor to such dealers were made in the name and on behalf of the defendant and all products so sold were owned solely by the defendant.

That by virtue of the various contracts, the defendant Lion was a "contractor", M. F. Taylor was a subcontractor, and plaintiff was a statutory employee of the defendant under the provisions of Section 6 of the Workmen's Compensation Law of the State of Arkansas, Ark.Stats. § 81–1306.

That plaintiff at the time of the accident was engaged in the performance of his duties as an employee of M. F. Taylor in carrying out the performance of an obligation of the defendant arising under the provisions of one of the Dealer Sales Agreements; that M. F. Taylor had failed to afford coverage for his employees under the provisions of the Workmen's Compensation Law and that the defendant had failed to require M. F. Taylor to carry such coverage; that at the time of the accident and at all times since defendant has been qualified in its own name and behalf as a self-insurer under the Workmen's Compensation Law of Arkansas.

That the right of plaintiff is limited solely and exclusively to the rights afforded him by the provisions of the Workmen's Compensation Law of Arkansas and that this Court has no jurisdiction of this suit.

Defendant attached to the motion as Exhibit A a copy of the Distributor's contract in force, at the time of the accident, between M. F. Taylor and the defendant. Defendant also attached as exhibits B and C copies of a "Dealer Sales Agreement" and an "Equipment Rental Agreement" entered into between the defendant and W. C. Breazeal, one of the retail dealers, and stated that the provisions of these contracts were identical with similar contracts entered into by the defendant with other retail dealers, and reflected the methods and procedures universally followed in the transactions between defendant and service station operators.

In support of the motion the defendant also attached the affidavits of C. E. Bethel, the defendant's Assistant Manager of Station Sales; M. F. Taylor, the defendant's Distributor at Hamburg, Arkansas; and Dave Peel, Chairman of the Workmen's Compensation Commission of the State of Arkansas.

On December 24, 1952, plaintiff filed his response to the motion for summary judgment in which he stated that "there is a genuine issue of fact to be presented to the court on the question pertaining to the relationship of the parties. Plaintiff further states that the motion filed herein by the defendant company is premature inasmuch as, at this stage of the proceedings, the genuine and material factual issues necessary to determine the relationship of the parties cannot be adequately presented to the court upon pleadings accompanied by affidavits."

Upon the issues raised by the defendant's motion and the plaintiff's response thereto, the parties filed briefs in support of their respective contentions and, at the request of the court, oral argument was heard on January 15, 1953. During the course of the oral argument, counsel for both parties agreed that there was no genuine issue of fact raised by the motion, its exhibits and the affidavits attached thereto, and that the relationship between defendant and M. F. Taylor, and the relationship between defendant and the various service station operators was correctly set forth in the exhibits and affidavits then on file, but the Judge suggested to counsel that, since the plaintiff in his response had alleged that there was a factual question as to the relationship of the parties and the complaint alleged that the gasoline was being loaded into the tank truck for delivery to Mrs. Joe Kusturin (erroneously spelled as Kustren in the complaint), he desired specific proof as to the relationship between Lion and Mrs. Kusturin. Thereupon, the attorney for Lion asked permission to furnish a copy of the contract under which Mrs. Kusturin was operating the filling station and supplemental affidavit or affidavits, which permission was granted. In accordance with the suggestion by the court, counsel for Lion furnished a photostatic copy of the contract entered into between Lion Oil Refining Company and Mr. Joe Kusturin, the now deceased husband of Mrs. Joe Kusturin, and a supplemental affidavit of M. F. Taylor disclosing that said contract was entered into on May 31, 1939, and that, until his death in 1945, Mr. Kusturin operated his service station under the provisions of the contract, and that Mrs. Kusturin, as his surviving widow, and the Lion Oil Company, defendant, as the successor to Lion Oil Refining Company, have at all times treated said contract as being in full force and effect; that the form upon which the contract was written has been discontinued by Lion and superseded by new contracts, except in a few instances, and that the forms designated as Exhibits B and C to the motion are now in use; that there was never any administration upon the estate of Joe Kusturin and that his business has been continued by his widow since his death.

Following the filing on January 23, 1953, of the photostatic copy of the contract between Mr. Joe Kusturin and the Lion Oil Refining Company, and the supplemental affidavit of M. F. Taylor, the plaintiff requested permission to file an amendment to his response to the motion and the exhibits thereto and to attach to his amended response an affidavit of Mrs. Joe Kusturin, which request was granted, and, in accordance therewith, the plaintiff on February

6, 1953, filed an amendment to his original response to the motion, in which he states:

"1. Plaintiff withdraws his statement in the original response to the effect that for purposes of determining the relationship of the parties a genuine issue of fact exists, and admits that, insofar as pertinent to the relief sought by defendant is concerned, such relationship can be adequately ascertained from an examination of the affidavits filed previously and the one accompanying this response.

"2. Plaintiff attaches hereto the affidavit of Mrs. Joe Kusturin and alleges that this affidavit, read in conjunction with the supplemental affidavit of M. F. Taylor, shows that the injury for which relief is claimed was received in a transaction of sale of goods and not in furtherance of any contract between Lion Oil and Mrs. Kusturin."

The affidavit of Mrs. Kusturin discloses that Joe Kusturin died intestate in Hamburg, Ashley County, Arkansas, on March 22, 1945; that he left surviving him the affiant, Mrs. Kusturin, and a son, Joe Kusturin, Jr.; that there was no administration of the estate of Joe Kusturin, deceased, and that the affiant had no knowledge of any contract between her husband and the Lion Oil Refining Company or Lion Oil Company.

At the time of the death of Joe Kusturin, there was one 10-gallon hand gasoline pump in operation at his store and service station. Also, there was one 50-gallon motor oil tank, one 65-gallon kerosene tank, one Curtis air compressor and one 555-gallon gasoline tank.

That, since the death of Joe Kusturin, she had been unable to properly attend to the sale of gasoline and oil products and as a consequence the amount of her purchases of gasoline and motor oil was greatly reduced; that, following the death of her husband, she did not and was not required to enter into any contract for the sale of the defendant's products and that, during the year 1952, she sold 1,665 gallons of gasoline and 24 gallons of motor oil.

That she has continued, since the death of her husband, to purchase Lion Oil Company's products and that all purchases made by her have been billed and invoiced to her in the name of Mrs. Joe Kusturin; that at the present time she has one Erie electric gasoline pump with which she dispenses gasoline to her customers, but that the pump is not in good repair.

That she had no knowledge of any contract between her husband and the Lion Oil Company and that she has never considered that she was selling Lion products under the terms or by virtue of any contract.

An examination of the contract between Lion and Mr. Kusturin and the typical contracts between Lion and Breazeal, Exhibits B and C, discloses that the contracts are substantially the same. These contracts are typical and reveal the relationship between Lion and its customers in the Hamburg area and reflect the reciprocal duties imposed upon Lion and the individual service station operators.

Lion agrees to sell to the retail dealer during the term of the agreement the petroleum products manufactured, refined and offered for sale in that locality. The service station operator agrees, among other things, to purchase an average minimum amount of gasoline, oil and, in some instances, kerosene, per month; to sell the products under Lion's brands and trade marks; to display at the premises only such advertising of Lion's products as it may furnish and approve; and to pay all expenses connected with the operation of the station and equipment. The agreement is personal to the service station operator and not assignable without written consent of Lion.

The current Equipment Rental Agreements which are entered into between Lion and most of the service station operators and which are substantially the same as the older form of contract that was entered into between Lion and Joe Kusturin provide that, for the nominal consideration of one dollar per year, Lion agrees to lease to the service station operator and to install certain tanks, pumps and other

equipment, the lease to be subject to certain conditions such as that the lessee must use the equipment for the sole purpose of storing, handling and advertising gasoline and other products supplied by Lion, and that the lessee will not encumber or remove the equipment. The agreement is personal to the lessee and assignable only upon written consent of Lion.

The Distributor's Contract entered into between M. F. Taylor and Lion provides, inter alia, that Lion will, from time to time, ship to itself at the bulk plant operated by Taylor reasonable quantities of each of the petroleum products listed in the contract; that Taylor shall devote so much of his time as is reasonably required for the sale of the products at prices to be fixed by Lion; that the products shipped by Lion to the bulk plant shall remain the property of Lion until sold or otherwise disposed of in the manner authorized in the agreement; that Taylor shall maintain records and at Lion's request make detailed reports concerning receipts, sales and stock inventories; that Taylor shall receive certain commissions as compensation for his services, the commissions to be based upon the quantity of products sold; that Taylor agrees to furnish at his sole expense all trucks, truck tanks, delivery cans, hose, and other equipment necessary for selling and delivering the products; that Taylor shall, at his expense, employ all persons whose services may be required to assist him in the performance of the agreement; that such persons employed by Taylor shall be exclusively the agents and servants of Taylor; that Taylor will, at Lion's request, transport from the bulk plant or any location in the territory assigned to him and install at the proposed new location in his territory any equipment which Lion desires to loan to any person to whom Distributor shall make sales of petroleum products, and that Lion shall reimburse Taylor his actual cost in installing such equipment for the use of buyers of the products; that no right of Taylor under the agreement shall be assigned by him.

M. F. Taylor in his affidavit states:

"All of Lion Oil Company's customers in the territory assigned to me under said Distributor's Contract were served by me with their requirements of Lion Oil Company products from the bulk plant of said Company at Hamburg, Arkansas, of which I was the operator under the provisions of said Distributor's Contract. All such sales were made for and in the name of Lion Oil Company, as seller, and all proceeds from such sales were remitted by me to the Company."

The affidavits of Taylor and of Dave Peel, Chairman of the Arkansas Workmen's Compensation Commission, reveal that prior to and on the date of the accident, February 6, 1952, M. F. Taylor had not qualified under the Arkansas Workmen's Compensation Act, either as a self-insurer or as an employer carrying insurance, for the benefit of his employees, covering liability under said Act, and also that on February 6, 1952, and prior thereto, Lion had qualified as a self-insurer under the Act.

Based upon the facts set forth in the contracts and affidavits hereinabove referred to, the parties make the following contentions:

Lion contends that by virtue of the contracts entered into between it and the various service station owners and the uniform conduct of the business, it is a contractor within the meaning of the Arkansas Workmen's Compensation Law; that Taylor, under its contract with Lion, was a subcontractor in the carrying out and servicing of the Dealer Sales Agreements between Lion and the station operators; that since Taylor had not qualified under the Workmen's Compensation Law of Arkansas, Lion became the statutory employer of plaintiff; that plaintiff was therefore covered and protected by the provisions of the Workmen's Compensation Law and that such remedy of the plaintiff was and is exclusive; that the state court from which the case was removed had no jurisdiction and that this court has none upon removal.

In his brief, plaintiff contended that as to him, Lion was a third party within the meaning of the Workmen's Compensation Law and is thus suable in a common law action. However, in his oral argument

plaintiff based his case upon the contention that Lion was not the statutory employer of plaintiff. More specifically, plaintiff contended in the oral argument that the relationship of statutory employer and statutory employee arises only in those instances where the work being performed by the subcontractor is work ordinarily done by employees of the prime contractor; that in the instant case the work being performed by Taylor was customarily performed by independent contractors; and therefore, Lion was and is not a statutory employer of plaintiff, and plaintiff may maintain a common law action against Lion.

In the amendment to his response to the motion, plaintiff now contends "that the injury for which relief is claimed was received in a transaction of sale of goods and not in furtherance of any contract between Lion Oil and Mrs. Kusturin," and further that the relationship "can be adequately ascertained from an examination of the affidavit(s) filed previously and the one accompanying this response."

Thus the contentions of the parties present to the Court two questions for decision: (1) Was Lion Oil Company the statutory employer of plaintiff and liable to him for compensation? (2) If Lion is liable for compensation, is that liability exclusive?

The plaintiff, in support of his contention that Lion was not his statutory employer, has cited and relies upon the following authorities: Cannon v. Crowley, 318 Mass. 373, 61 N.E.2d 662; Settle v. Baldwin, 355 Mo. 336, 196 S.W.2d 299; Britton v. Industrial Commission, 248 Wis. 549, 22 N.W.2d 525; and Volume 1, Larson, Workmen's Compensation Law, Section 49.12. The essence of this contention is stated in Section 49.12 of Larson, supra, at page 725, wherein the author, in speaking of the so-called "contractor-under" statutes, said:

"Practically all of the cases of general interest interpreting this type of statute are addressed to one question: when is the sub-contracted work part of the regular business of the statu-

tory employer? The statutory language lying behind this question varies somewhat; some acts speak of work which is 'part of or process in' the employer's trade or business, perhaps excluding, for good measure, work which is 'merely ancillary and incidental' to such trade or business; some use the phrase 'any work which is a part of his trade, business or occupation'; and there are many other variants. But, with a surprising degree of harmony, the cases applying these assorted phrases agree upon the general rule-of-thumb that the statute covers all situations in which work is accomplished which this employer, or employers in a similar business, would ordinarily do through employees."

It will be noted that Larson is speaking of statutes containing various provisions limiting the application of said statutes to certain types of work. Likewise, the cases cited by plaintiff all involved such varied limitations. The Massachusetts Act was construed in Cannon v. Crowley, supra, as follows [318 Mass. 373, 61 N.E.2d 664]:

"But to come within the statute, the particular activity in which the employees of an independent contractor are engaged must be a *part of or process in* the trade or business conducted by the insured principal and not *merely ancillary and incidental* thereto * * *."

The Missouri Act referred to in Settle v. Baldwin, supra [Part (a) of Section 3698, Rev.St.Mo.1939], provides:

"Any person who has work done under contract *on or about his premises* which is an *operation of the usual business* which he there carries on shall be deemed an employer and shall be liable unde this chapter to such contractor, his subcontractors, and their employees, when injured or killed on or about the premises of the employer *while doing work which is in the usual course of his business. * * *.*"

The Wisconsin Act construed in Britton v. Industrial Commission, supra, St.1943, § 102.06, provides as follows:

"An employer shall be liable for compensation to an employe of a contractor or subcontractor under him who is not subject to this chapter, or who has not complied with the conditions of section 102.28(2) in any case *where such employer would have been liable for compensation if such employe had been working directly for him * * *.*" [248 Wis. 549, 22 N.W.2d 527]

No doubt the cases relied upon by plaintiff state the law in those jurisdictions as applied to the particular statutory provisions therein construed. But the Supreme Court of Arkansas has said in Hobbs-Western Company v. Craig, 209 Ark. 630, at page 636, 192 S.W.2d 116, at page 119, that:

"So far as our investigation·has disclosed, Section 6 of the Arkansas act is similar to, but not identical with the corresponding provisions in the law of any other state."

█ The jurisdiction in the instant case is based solely upon diversity of citizenship and the amount involved, and therefore, this Court is bound by the provisions of the Arkansas Workmen's Compensation Law and the interpretation placed upon that Law by the Arkansas Supreme Court.

Section 6 of Act 319 of the Acts of 1939 of the General Assembly of the State of Arkansas, Section 81–1306, Ark.Stats.1947, Ann., provided:

"A contractor in the performance of whose contract one or more persons are employed, either by himself or by a subcontractor, who subcontracts all or any part of such contract shall be liable for and shall pay compensation to any employee injured whose injury arises out of and in the course of such employment, unless the subcontractor primarily liable therefor has secured compensation for such employee so injured as provided in this act * * *."

This section was repealed by Init.Meas. 1948, No. 4, § 50. The section now in force, Init.Meas.1948, No. 4, § 6, Section 81–1306, Arkansas Statutes 1947 Annotated, 1951 Supp., provides:

"Where a subcontractor fails to secure compensation required by this Act, the prime contractor shall be liable for compensation to the employees of the subcontractor. Any contractor or his insurance carrier who shall become liable for the payment of compensation on account of injury to or death of an employee of his subcontractor may recover from the subcontractor the amount of such compensation paid or for which liability is incurred. * * *"

It will be noted that neither the old nor the new Arkansas Workmen's Compensation Law contains such a limiting provision as did the Acts referred to in the cases cited by plaintiff. Therefore, it is not at all surprising that the Arkansas Supreme Court has apparently refused to follow the reasoning employed in the cases relied upon by plaintiff. In Brothers v. Dierks Lumber & Coal Co., 217 Ark. 632, 232 S.W.2d 646, the Court construed Section 6 of the 1939 Act.[1]

The court at page 638 of 217 Ark., at page 650 of 232 S.W.2d, said:

"We do not hold that a mere contract for the sale of goods makes either the buyer or seller, or both, a 'contractor' within the meaning of section 6, but we are committed to the view that *when the contract to sell is accompanied by an undertaking by either party to render substantial services in connection with the goods sold, that party is a 'contractor'* within the meaning of the section.

"Once it is determined that Dierks was a 'contractor' under its Forest Service contract, it follows automati-

---

1. The opinion in the Brothers case was delivered July 3, 1950, and Init. Meas. 1948, No. 4, was then in effect. However, the opinion does not disclose the date of the accident, and apparently the reason the Court applied the 1939 Act is that the accident occurred prior to the effective date of the 1948 Measure. See Init. Meas. 1948, No. 4, § 3; Section 81–1303, Arkansas Statutes 1947 Annotated, 1951 Supp.

cally that Dan Durham was a 'subcontractor', since he was performing under contract with Dierks a part of the work—removal of the merchantable timber—called for by the Dierks-Forest Service contract. The fact that Durham was not cutting timber, but only removing it, is unimportant; a single subcontractor is not expected to do all the work which the principal contractor has agreed to do. What Durham was doing was an essential part of the interdependent whole called for by the Dierks-Forest Service contract. And Durham was uninsured. * * *

"* * * we deem it safe to say that the framers of Amendment 26 had in mind the workmen's compensation laws of a majority of the other states, already in force in 1938. *Most of these laws included the concept of the statutory employee, as it now appears in Arkansas in our section 6,* as a part of their provisions for 'compensation to be paid by employers for injuries to or death of employees'. * * *" See, also, Hobbs-Western Co. v. Craig, supra.

■ The import of these decisions is that under Section 6 of the 1939 Act, Section 81-1306, Arkansas Statutes, 1947, supra, "if a subcontractor does not carry compensation insurance (or self-insurance) on his employees, they are deemed 'statutory employees' of the main contractor for purposes of the Workmen's Compensation Act." Section 6 of the new Act is substantially the same as Section 6 of the 1939 Act and the reasoning of these two cases applies with equal force to the new Act.

Neither the Arkansas Workmen's Compensation Law nor the Arkansas decisions place any limitation upon the type of work being performed by the subcontractor. Thus, if Lion was a contractor and Taylor was a subcontractor within the meaning of the Arkansas law, and if Taylor did not carry insurance as provided by the Act, Lion was the statutory employer of Taylor's employee, the plaintiff, regardless of whether or not the work being performed by Taylor was work ordinarily done by an independent contractor or was ordinarily done by employees of the prime contractor. It is admitted that Taylor did not have insurance as required by the Act, and therefore, whether or not Lion was the statutory employer of plaintiff depends upon whether Lion was a contractor and Taylor a subcontractor within the purview of the Arkansas Workmen's Compensation Law.

■ As heretofore set forth, the test for determining whether a "contractor" relationship exists is stated in the opinion in Brothers v. Dierks Lumber & Coal Company, supra, at page 638 of 217 Ark., at page 650 of 232 S.W.2d, as follows:

"We do not hold that a mere contract for the sale of goods makes either the buyer or seller, or both, a 'contractor' within the meaning of section 6, but we are committed to the view that when the contract to sell is accompanied by an undertaking by either party to render substantial services in connection with the goods sold, that party is a 'contractor' within the meaning of the section."

■ Applying that test to the facts in the instant case, the court is convinced that the agreements between Lion and the various service station operators, as well as the contract under which the gasoline and other products were delivered to Mrs. Kusturin, constitute Lion a "contractor". The services being rendered to Mrs. Kusturin were the same as were required to be rendered by Lion in its contracts with the other service station operators. Lion undertook and agreed to sell to the retail dealer any of the petroleum products offered by it for sale in the Hamburg locality and in addition thereto, for a nominal consideration, leased to such dealers and installed tanks, pumps and other equipment for the use of the retail dealers. The retail dealer agreed and undertook to purchase a minimum amount of gasoline, motor oil and kerosene per month; to sell the products under Lion's brands; to display on the premises such advertising as the defendant might furnish and approve in the advertising of the products; to use the equipment furnished by Lion for the sole purpose of storing, handling and selling

and advertising Lion's products; and to indemnify and save Lion harmless from any and all liability for loss, damage, injury or other casualty to persons or property caused or occasioned by any leakage, fire or explosion of gasoline or kerosene or other products stored in the tanks or drawn through the pumps furnished by Lion, whether due to imperfection in the equipment or any part thereof, latent or patent, and whether the same arose from negligence or otherwise, and for any and all liability arising from any other cause.

Upon the death of Mr. Kusturin, Mrs. Kusturin and her son chose to continue the business and no administrator of the estate was appointed. No change in the relationship occurred and she continued to avail herself of the substantial services that had been rendered by Lion to her husband and which Lion continued to furnish her. In fact, her affidavit lists the identical property which Lion had caused to be installed under the contract with her husband and she continued to avail herself of the use of that property and other services rendered by Lion to aid her in the sale of the products. The fact that she did not purchase the minimum monthly amounts of the products was waived by Lion and it continued not only to sell to her but continued to allow her to use the equipment and services without which she could not have continued to operate a service station. By so conducting the business, Mrs. Kusturin became personally liable for all debts contracted after the death of her husband. In other words, she took over and continued to accept the benefits under the contract without any objection on the part of Lion.

It seems clear that, by virtue of these contracts, both Lion and the retail dealer undertook to render substantial services in connection with the goods sold and that they are both contractors within the meaning of Section 6 of the Arkansas Workmen's Compensation Law, Section 81–1306, Arkansas Statutes 1947 Annotated, 1951 Supp.

Lion, being a contractor with Mrs. Kusturin and the other retail dealers, "it follows automatically that" Taylor, the bulk plant operator, "was a 'subcontractor,' since he was performing under contract with" Lion. "a part of the work * * * called for by the" Lion-Retail Dealers' contracts. What Taylor "was doing was an essential part of the interdependent whole called for by the" Lion-Retail Dealers' contracts. See Brothers v. Dierks Lumber & Coal Company, supra, at page 639 of 217 Ark, 232 S.W.2d 646. In other words, under Taylor's contract with Lion, he was to furnish at his sole expense all trucks, truck tanks, delivery cans, hose, and other equipment necessary for selling and delivering the products of Lion to the trade in the territory assigned to him; to employ all persons whose services might be required to assist him in performing the agreement, such persons to be exclusively the servants and agents of Taylor; to maintain records of all products received at the bulk plant and sold by him and to furnish to Lion, at Lion's request, detailed reports concerning receipts, sales and stock inventories; and, at Lion's request, to transport from the bulk plant or any location in the territory assigned to him and to install at the proposed new location in his territory any equipment which Lion might desire to loan to any person to whom Taylor should make sales of petroleum products under the terms of the agreement. In effect, Lion was using Taylor as its instrumentality in fulfilling its contracts with the retail dealers, that is, in delivering to such dealers any of the petroleum products offered by Lion for sale in the locality, and in furnishing to and installing for such dealers, tanks, pumps, and other equipment to be used by them "in connection with the goods sold."

Therefore, Taylor was a subcontractor within the rule expressed in Brothers v. Dierks Lumber & Coal Company, supra, and this is true whether or not Taylor was an independent contractor. While the case of Magnolia Petroleum Company v. Griych, 206 Ark. 352, 176 S.W.2d 435, might have thrown some doubt upon the effect of the independent contractor relationship, any uncertainty fostered by that case vanished in the wake of the Brothers case, supra, in which the Court at page 633

of 217 Ark. at page 646 of 232 S.W.2d, said:

"We find it unnecessary to pass upon this fact question, or upon the admissibility of the proffered evidence, because it appears that the other ground of appeal, primarily one of law, requires reversal in any event. This ground assumes that Durham was an independent contractor, as contended by Dierks. It has to do with the interpretation of section 6 of the 1939 Workmen's Compensation Act, Ark. Stats., § 81–1306."

In holding that Durham, although an independent contractor, was nevertheless a subcontractor, the Court dispelled any doubt that might have arisen because of Magnolia Petroleum Company v. Griych, supra.

Having decided that Lion was a contractor and Taylor a subcontractor, and in view of the fact that Taylor did not carry insurance as required by the Workmen's Compensation Law of Arkansas, the Court necessarily concludes that Lion was the statutory employer of Taylor's employees, including plaintiff, and is liable to plaintiff for compensation under the act.

Having concluded that Lion was a statutory employer, that the plaintiff was a statutory employee, and that Lion is liable to plaintiff for compensation, the remaining question is whether this liability is exclusive. Learned counsel for the parties have cited many decisions from other courts in support of their respective contentions, but those decisions, based as they are upon the provisions of the particular acts there under consideration, are not conclusive of the rights and liabilities of the parties under the law of Arkansas.

In Hobbs-Western Co. v. Craig, supra, the Court at page 635 of 209 Ark., at page 119 of 192 S.W.2d, said:

"The Arkansas Workmen's Compensation Law was not taken in whole from the statutory law of any particular state, and we therefore have no previous adjudications of such other state as binding on us in our construction of the Act. We are thus free to give the Arkansas law an interpretation consistent with the liberal spirit of the Act."

The Court further commented upon the purpose of the Workmen's Compensation Laws and stated that one of the purposes was "to protect the employees of sub-contractors who are not financially responsible; to induce all employers to carry insurance; or to make the principal contractor a guarantor of the personal injury obligations of the sub-contractor."

Section 81–1304, Arkansas Statutes 1947 Annotated, 1951 Supp.; Init.Meas.1948, No. 4, Section 4, provides:

"The rights and remedies herein granted to an employee subject to the provisions of this Act (§§ 81–1301—81–1349), on account of injury or death, shall be exclusive of all other rights and remedies of such employee * * * on account of such injury or death, except that if an employer fails to secure the payment of compensation, as required by the Act, an injured employee * * * may, at his option, elect to claim compensation under this Act or to maintain a legal action in court for damages on account of such injury or death. In such action it shall not be necessary to plead or prove freedom from contributory negligence nor may the defendant employer plead as a defense that the injury was caused by the negligence of a fellow-servant, nor that the employee assumed the risk of his employment, nor that the injury was due to the contributory negligence of the employee."

Although the Arkansas Supreme Court has not passed upon the precise question of whether the above section applies to *statutory* employers and employees, the opinion in the Brothers case indicates that the Court considered the rights and remedies under the act to be exclusive, even as applied to a statutory employee. In other words, in the Brothers case the Court pointed out the fact that Amendment 26 to the Arkansas Constitution prohibits laws *limiting* the amount to be recovered for injuries and does not deny the legislature's

right to *create* new causes of action. This being true, there would have been no question whatsoever as to the constitutionality of Section 6 of the Arkansas Workmen's Compensation Law if the section merely created a new cause of action as would be the case if recovery thereunder is not exclusive. Thus, the fact that the Court discussed the constitutionality of Section 6 of the Act in terms of the intention of the framers of Amendment 26 to permit passage of an Act including the concept of statutory employee indicates that the Court considered the liability under Section 6 to be exclusive. Stated differently, the Arkansas Supreme Court in the Brothers case said that even though Section 6 of the Workmen's Compensation Act limits the amount to be recovered for injuries—since the recovery thereunder is exclusive and precludes recovery of a larger amount at common law—nevertheless the section is constitutional because the framers of the Amendment intended to permit such a result through the concept of the statutory employer-employee relationship.

In essence, then, the Arkansas decisions lead the Court to believe and to hold that once the relationship of statutory employer and statutory employee arises, such parties have the same rights and the same liabilities under the Act as if they were employer and employee by reason of a contract of employment. That is, when the Act provides that the "rights and remedies herein granted to an employee * * * shall be exclusive * * *" such provision applies to *statutory* employees as well as contractual employees, and therefore plaintiff, being a statutory employee of Lion, has only the rights and remedies granted him by the Workmen's Compensation Law of Arkansas.

If neither Lion nor Taylor had secured the payment of compensation the plaintiff would have had the right to maintain a common law action for damages and the employer or employers would be deprived of the ordinary defenses to such common law action. But Lion had secured and had in force compensation insurance and the remedy of the plaintiff against Lion for compensation is exclusive. The fact that

Taylor did not have compensation can not subject Lion to a common law action and deprive it of the usual defenses thereto since, it, as a statutory employer, discharged its obligation to the plaintiff and other employees by providing compensation.

The plaintiff in his original brief cited and relied upon the case of Anderson v. Sanderson & Porter, 8 Cir., 146 F.2d 58, but in view of the decisions of the Arkansas Supreme Court in Hobbs-Western Co. v. Craig and Brothers v. Dierks Lumber & Coal Co., supra, that decision is not controlling in the instant case.

 The rights and remedies granted an employee by the Workmen's Compensation Law are exclusive, and the State Court did not have jurisdiction of the instant case and this Court did not acquire jurisdiction upon the removal of the case. See, Shultz v. Lion Oil Co., D.C.W.D.Ark., 106 F.Supp. 119, and cases cited therein.

The motion for summary judgment should be granted and the complaint of the plaintiff dismissed for lack of jurisdiction.

An order in accordance with the above is being entered today.